## The Inhabitants of LUDLOW *versus* CHESTER SIKES.

A warrant for the organization of the first parish in a town, containing an article " to choose a clerk and other necessary and usual parish officers," but without any article presenting directly the question whether the members would vote to organize themselves as a parish or not, was *held* to give sufficient notice of the purpose of the meeting.

The service of such warrant by posting it up in three public places seven days before the meeting, (which was the usual mode of serving warrants for meetings of the inhabitants of the town,) was *held* to be sufficient.

By an act of the legislature erecting part of a town into a new town it was provided, that the new town should have a certain proportion of all ministry and school lands. Afterwards, for a consideration named and for adjusting controversies which had arisen between the old and the new town, the old town agreed to convey a portion of the school lands, and that the first parish, with their minister, should convey a portion of the ministry lands, to the new town, for the sole use of the ministry in the new town, and a deed was accordingly made of a portion of the school and ministry lands, *habendum* to the inhabitants of the new town " for the sole and only use and benefit and interest of the ministry in said town and not to any other use or purpose, forever." The new town accepted the deed and afterward sold the lands and took therefor the promissory notes of the purchasers, and for more than thirty years applied the interest in payment for the services of ministers of the gospel within the town. It was *held*, that the new town took the school land, as well as the ministry land, in its parochial capacity, and that upon the separate organization of the first parish in that town the promissory notes became the property of the parish ; and that even if the two towns transcended their powers in conveying and taking the school land to the use of the ministry, it was too late, after the acquiescence of more than thirty years, to disturb their acts.

TROVER for certain promissory notes, alleged to be the property of the plaintiffs.   Trial before *Shaw* C. J.

By an act of the legislature in 1774, a part of the town of Springfield was set off and erected into a separate district by the name of Ludlow, (which was subsequently incorporated as a town,) and it was enacted, " that the said district of Ludlow shall have and hold their share and proportion of all ministry and school lands lying in the outward commons, so called, on both sides of Connecticut River, in said Springfield."

These lands were anciently, by votes of the proprietors of common and undivided lands of Springfield, appropriated partly to the ministry and partly to schools.

An agreement was entered into on the 15th of June, 1802, between the town of Springfield and the first parish in Springfield, on the one part, (by their committee for settling all controversies, claims and demands between the towns of Ludlow and

Springfield, and also for selling the ministry and school lots in Ludlow,) and the town of Ludlow on the other part, (by their committee authorized to settle all disputes respecting the ministry and school lands, and all other matters in dispute with the town of Springfield,) in which agreement it is stipulated, that the town of Springfield shall sell and convey to the town of Ludlow all their right and title to the school lot, so called, in Ludlow, and hat the town of Springfield and the first parish shall, with the minister in the first parish, sell and convey all their right and title to that part of the ministry lot, so called, lying in Ludlow, " to be to the sole and only use, in trust for the ministry in said town of Ludlow, and not to be appropriated to any other purpose ; unless the said town, with the consent of the minister thereof, shall sell the said lots, or any part of them, and shall vest the proceeds of said sales in other lands within one year from such sales, which shall be conveyed to the above use and trust " ; and the town of Springfield shall make to the town of Ludlow a discharge from all claims and demands, &c.; and the town of Ludlow agree, in consideration thereof, to pay to the town of Springfield and the first parish in Springfield $350, and to release to the ministry in the first parish in Springfield, the residue of said ministry lot, &c., and also release to the town of Springfield all their right to the school lots, so called, in West Springfield, and also discharge the town of Springfield from all claims and demands, &c.

By an indenture, made on the 27th of September, 1802, between the town of Springfield, of the first part, the town of Ludlow, of the second part, Bezaleel Howard, the minister of the first parish in Springfield, of the third part, and the first parish in Springfield, of the fourth part, the town of Springfield quitclaim to the town of Ludlow, a lot of land formerly by the town of Springfield " appropriated, sequestered and laid out for a school lot," &c. " to have and to hold to the said inhabitants of said town of Ludlow, for the sole and only use and benefit and interest for the ministry in said town of Ludlow, and not to any other use or purpose, forever." And Howard, with the assent and confirmation of the first parish in Springfield, together with the town of Springfield, quitclaim to the town of Ludlow, all their respective right and title to that

part of the ministry lot, so called, which lies in Ludlow, which lot was anciently appropriated, granted and laid out for the ministry, " to have and to hold to them, the said inhabitants of the said town of Ludlow, forever ; the last abovementioned premises, with the appurtenances, to the sole and only use of the ministry in said town of Ludlow, and not to be appropriated for any other use and purpose ; unless the said town of Ludlow shall, with the consent of any settled minister thereof, sell the same or any part thereof, and vest the whole of the proceeds of such sale or sales in other lands, which shall be conveyed to the above uses and trusts."    And the town of Ludlow quitclaim to Howard, for the use of the ministry of the first parish in Springfield, all their right and title to the residue of the ministry lot, &c. and quitclaim to the town of Springfield all their right and title to the school lots, so called, lying either in Springfield or West Springfield.    The towns of Springfield and Ludlow also executed mutual discharges from all claims and demands.

On the 6th of December, 1802, the town of Ludlow voted to accept the foregoing deed.

In November 1806, the town of Ludlow voted to accept the report of a committee, which report set forth that the committee had sold the whole of the ministerial lot and a part of the school lot ; that they had executed warranty deeds of the same for and in behalf of the inhabitants of the town ; and that they had received, in consideration of the sales, and for the use and benefit of said inhabitants, the notes and obligations enumerated in the report.

The notes for which this action was brought, were the proceeds of the lands thus sold, and were payable to the inhabitants of the town of Ludlow, being either the original notes or renewals of them.

From 1806 until 1835, the town from time to time chose a committee to take care of the fund arising from these sales, frequently designating it as " the ministerial fund," and applied the interest towards paying for the services of ministers of the gospel, occasionally specifying that each denomination of christians in the town should draw their proportion of the interest and expend it in the meetinghouse.  From 1819 to 1831 the

Ludlow
*v.*
Sikes.

Rev. E. B. Wright was the settled minister of the town, and during that period he received the income of this fund as a part of his salary.

On November 9th, 1835, the town voted that the interest arising from " the ministerial fund " be appropriated to the use of schooling ; and, in February 1836, they chose a committee with full powers to demand all notes belonging to the town, and to institute suits for the recovery of the same.

On the 24th of November, 1835, Oliver B. Morris, a justice of the peace for the county of Hampden, on the written application of eighteen persons, calling themselves legal voters in the first parish in Ludlow, and representing that this parish had never been organized pursuant to the statutes respecting parishes, and requesting that a warrant should be issued for calling the first meeting of the parish, issued a warrant directed to Daniel Miller, one of the applicants and a member of the parish, requiring him to warn the inhabitants of the parish, qualified by law to vote in parish affairs, to assemble at the meetinghouse in Ludlow on the 9th of December then next, at one o'clock in the afternoon, to act on the following article, viz.: " To choose a clerk and other necessary and usual parish officers."

Miller returned, that he had served the warrant, by posting it up " in three public places in Ludlow ten days previous " to the time appointed for the meeting.

The meeting was held, pursuant to the warrant, Morris presiding, and it was " voted to organize the parish." A clerk was then chosen and sworn ; then a moderator, the clerk presiding at the choice ; and afterwards a treasurer, assessors, a committee to superintend the ministerial fund, a committee to supply the pulpit, and a committee to seat the meetinghouse. At a parish meeting called by a warrant from these assessors and held on the 2d of January, 1836, Simeon Pease, Simeon Jones and Chester Sikes were chosen a committee to superintend the ministerial fund.

In regard to the mode of warning the first meeting of the parish, it appeared, that in 1800 the town of Ludlow voted that town meetings should be warned by setting up notifications at the meetinghouse and at the two nearest public houses in the

town. In 1821 it was voted, that posting up notifications at three public places within the town, according to law, be considered a legal warning, viz. at Washington Jencks's, the meetinghouse, and Ely Fuller's. Evidence was received, subject to the plaintiffs' objection to its admissibility, as to the usage of the town. One Frost testified, that the mode of warning town meetings in Ludlow has been, to post notifications at three public places, generally ; one at the meetinghouse, and one at each of two taverns. For annual meetings and elections the practice has been to give fourteen days notice, but for other meetings to give seven days notice. One Burr testified, that the practice for twenty years had been, to give seven days notice for common meetings for town affairs, fourteen days for elections, and fourteen days for elections of governor, senators, and representative to Congress.

No territorial or poll parish was ever incorporated, in Ludlow, either by special act of legislation, or under the provisions of the acts for religious freedom, prior to November 1835 ; but some of the inhabitants of the town had by certificate and by force of the acts of the legislature setting them off, at different times, become members of parishes out of the town of Ludlow.

On the 13th of February, 1836, the defendant held the promissory notes in question, and upon a demand then made by an authorized agent of the town of Ludlow, he refused to deliver them, on the ground that they constituted a part of the ministerial funds of the first parish in Ludlow.

The defendant contended, that the town of Ludlow held the lands sold and the proceeds of the sales, in its parochial character, as ministerial lands and funds ; that until 1835 the town constituted but one parish ; that in that year the first parish in Ludlow was duly organized ; that thereupon it became the successor of the town as to all its parochial rights, and this ministerial fund vested in the parish, and the notes in question were rightfully held by the defendant as the agent of the parish.

The plaintiffs objected to any proof of the agency of the defendant for the first parish in Ludlow, because no such parish had ever been duly organized or had ever had any legal existence : —

Ludlow
v.
Sikes.

1. Because there was no first parish, as distinct from the town, within the meaning of the statute, when such organiza-- tion is supposed to have taken place ;

2. Because there was no clause in the warrant to enable members to determine by a vote, whether they would change their organization and become organized as a parish, or not ; and the members of the first parish therefore were not legally warned ;

3. Because the return of the warrant showing a posting of notices at three public places, by Daniel Miller, one of the pe- titioners, was not a sufficient legal notice.

A verdict was taken by consent, for the plaintiffs, for $2000, subject to the opinion of the whole Court upon the question whether the plaintiffs were entitled to recover. If they were not, the verdict was to be altered so as to stand as a general verdict for the defendant.

*Sept. 28th.*    *I. C. Bates* and *Forbes*, for the plaintiffs.

*O. B. Morris, Chapman* and *Ashmun*, for the defendant.

Morton J. afterward drew up the opinion of the Court.* The object of this suit is to recover damages for the detention of certain promissory notes claimed by the plaintiffs. Their right to recover depends upon the ownership of the notes. Are they the property of the plaintiffs ? They are in form payable to the town of Ludlow. They were originally given in consideration of the conveyance of certain lands formerly owned and sold by Ludlow. Of course, if the lands were the property of the *municipal* corporation, the notes would belong to the town of Ludlow.

The whole difficulty in the case arises from the double ca- pacity with which the towns of this Commonwealth are invest- ed. All the towns originally acted, and some of them still continue to act, not only as *towns* but also as *parishes*, per- forming with the same organization, and by the same officers, both *municipal* and *parochial* duties. Hence it frequently be- comes difficult to determine when they act in the one capacity and when in the other. Very often the only criterion is the character of the act done. If it be an act falling within the

---

* *Dewey* J. did not sit in the cause.

province of a town, it is deemed *municipal;* if within the province of a parish, it is deemed *parochial.* It formerly was usual, and even now is not very infrequent, to have only one series of records, in which are indiscriminately blended acts and votes of both characters.

The land in question was, when sold, undoubtedly the property of Ludlow, but whether it held it in its *municipal* or its *parochial* character, is the question which we are now to decide. These two characters, in all legal inquiries, must be kept distinct, and should no more be confounded than if they were two separate corporations. Their powers and duties are not only different, but quite dissimilar. And the union of the two capacities in one corporate entity by the consequent blending of their votes and proceeding, tends to lead to the confusion of legal principles.

A town, by its incorporation, becomes invested with the powers and subject to the duties and liabilities of a parish. These continue until a legal separation is effected. This generally in a short time is rendered expedient, by the union of some of the inhabitants to other religious societies, thus making the legal voters in the two cases different. When *all* the inhabitants of a town assume the character of a parish by organizing as such, or by becoming members of other religious societies, the *parochial* functions of the town cease.

The town of Ludlow continued to act in this double capacity from its first incorporation in 1774, till December 1835, when an attempt was made to give to it the separate organization of a parish. If this attempt was a successful one, it divested the town of its *parochial* character and transferred all its *parochial* powers, property and liabilities to the newly organized body. Or rather it constituted a separation of the two functions with their incidents, into two legal beings. But if here was no legal organization of a parish, then the town remains invested with both capacities and is entitled to recover the property, whether it may hold it in the one character or the other.

Some of the inhabitants of Ludlow had from time to time united themselves with other religious societies within and without the territorial limits of the town. The residue re

mained members of and constituted the first parish     They might continue to perform their parochial duties under the town organization, or, if they deemed it more convenient, might organize themselves as a separate corporation, thus making themselves successors of the town in its *parochial* character.

The *St.* 1786, *c.* 10, regulated the manner of calling and conducting parish meetings.   But it applied only to existing religious corporations, and did not extend to the primary organization of such bodies.   Hence when a new parish or religious society was created, a special legislative provision was deemed necessary to enable it to choose the officers or agents required for the exercise of its corporate functions.   Under this statute, § 2, a justice of the peace was authorized, upon proper application, to call a meeting whenever there was a want of the proper officers, for the purpose, or they should " unreasonably refuse " to do it.   This provision doubtless applied to towns acting *parochially*, as well as to parishes, and gave to justices the power to call meetings only in the cases therein specified.

The *St.* 1811, *c.* 6, provided for the formation of new re ligious societies and the organization of existing ones, without the intervention of the legislature or the civil magistracy

The *St.* 1823, *c.* 106, § 1, without affecting the then existing modes of calling meetings of, and organizing, religious societies, added some new and more liberal provisions on the subject.   *Oakes* v. *Hill*, 10 Pick. 344 ; *Fisher* v. *Whitman*, 13 Pick. 350.   It conferred upon " any justice of the peace " the general power in all cases where a parish or religious society " is not organized agreeably to law," " upon application therefor, by any ten or more of the legal voters of such parish or religious society, to issue a warrant for calling the first meeting .thereof."   This provision is not only sufficient to extend to the first organization of a parish, which gives to it a separate corporate existence and by severing the parochial from the municipal powers, destroys the double capacity of the town, but seems to be expressly adapted to and intended for that purpose.

The *St.* 1834, *c.* 183, § 6, is a revision, or, more properly, a reenactment of the above section.   It is almost a literal

transcript of it and does not make the slightest alteration of its import. This latter is again revised in the Revised Stat. *c.* 20, § 26, 27, and 28. Although these sections contain some change of the language and the collocation of the words, yet we think the construction is the same, except that the application may be made by *five* instead of *ten* voters.

More than ten of the qualified voters of the parish in Ludlow applied to a magistrate of the county, to issue a warrant, which he accordingly did, directed to one of the applicants, who made service thereof. And in pursuance of it a meeting was holden and the usual parish officers were chosen. This was the proper mode of organizing a parish. The warrant was sufficient. The article, " *To choose a clerk and other necessary and usual parish officers,*" gave the requisite notice of what officers might be chosen, and necessarily presented to the meeting the option to choose or to refuse to choose them. The service was in the manner then usual, and was made long enough before the time appointed for the meeting. We are therefore of opinion that the parish was lawfully organized.

Although the eleventh amendment of our constitution and our recent legislation, have made important alterations in our laws concerning religious societies and the support of public worship, and nearly destroyed the distinction between *territorial* and poll parishes, yet the principles of corporate identity and succession remain unchanged. The parish having come into legal existence succeeded to all the parochial property in the possession of the town. Whether it was a ministerial fund, or parochial or ministerial land, would, in no way, affect their right to the succession. If the notes in question were parochial property, they vested in the parish and are rightfully held by the defendant as their treasurer and agent. This brings us back to the main question in the case. Were the lands for which the notes were given, held by the town of Ludlow in its *municipal* or its *parochial* capacity ?

From the examination of the records it is apparent, that these lands as they were originally held by the town of Springfield were of two kinds and held in different rights, a part of them having been reserved for the support of schools, and a part for the support of the ministry. When the new town was

28

incorporated, it was provided in the act of incorporation, that Ludlow " *shall have and hold their share and proportion of all ministry and school lands,*" *&c. to be divided and set off according to the amount of tax by them paid.*

This provision for the division of the property holden by the former town, between the old and new towns, was not designed and had no tendency to change the nature or tenure of the property. It all remained subject to the same uses as before, although a part of it might pass to the new corporation. A long time elapsed before any division was made between the two towns. During this period, the legal estate not having been conveyed to the new town agreeably to this provision, necessarily remained in the old one.

In 1802 the two towns enter into an agreement for the settlement of the controversies which had grown out of their separation, and of their respective claims upon each other In this compact, for a consideration named, and for the adjustment of their controversies, the town of Springfield agrees to sell and convey to Ludlow "*the school lot*" so called, lying in Ludlow, and that the First Parish in Springfield, with their minister, shall sell and convey a certain part of "*the ministerial lot*" " to be to the sole and only use, in trust for the ministry in said town of Ludlow ; and not to be appropriated to any other purpose ; unless the said town, with the consent of the minister thereof, shall sell the said lots, and shall vest the proceeds of said sales in other lands within one year from said sales, which shall be conveyed to the above use and trust."

It is perfectly clear that the parties to this arrangement, intended to make no distinction between these different parcels of property, but to appropriate and dedicate both to ministerial or parochial uses. This agreement was fully executed. The town of Springfield, the First Parish in Springfield and its pastor, and the town of Ludlow in its double capacity, were the parties to it. All their conflicting claims, disputes and controversies were adjusted, by a general compromise. It cannot be doubted that they had the power to make such a compromise. Under the act of incorporation, the town of Springfield had authority to convey a certain portion of its school land ; the minister and parish had power to convey a portion of their

ministerial land ; the town of Ludlow might relinquish a portion of each to get a good title to the residue. And it is not easy to perceive why they might not release their claim to one kind of the estate, that they might receive a conveyance of the other. If, in the adjustment of disputes between the two towns, Ludlow, for a sufficient consideration, had released their whole claim to both kinds of estate, the release would have been valid. The fact that they released their claim to *school lands*, can have no tendency to invalidate or in any manner affect the conveyance to them of *ministerial lands*.

In execution of the agreement between the two towns Springfield conveyed to Ludlow a lot or tract of land which, as they recite, " the said town of Springfield had appropriated, sequestered and laid out as a *school lot*," "to be appropriated by said town of Ludlow to the use of the ministry in said town, and to no other use or purpose. To have and to hold to the said inhabitants of said town of Ludlow for the sole and only use and benefit and interest of the ministry in said town of Ludlow, and not to any other use or purpose forever." The first parish and its pastor use substantially the same language in making a conveyance of " the ministry lot." This language leaves no doubt of the intention of the parties. This conveyance was expressly by vote accepted by Ludlow, which must have been a *parochial* act, and was in pursuance of the previous assent of the town in its *municipal* capacity.

If the town of Ludlow was willing to have all the land which was to be conveyed, granted and appropriated to the use of the parish, and the parish was willing to receive it, why might not the town of Springfield thus convey it to the parish ? But whatever might have been the general powers of these corporations, we find in point of fact, that the town of Springfield did convey their school lot to Ludlow, for the use of the parish, that Ludlow did accept of the conveyance, that the conveyance was made in pursuance of an agreement or compromise to which Ludlow, in both characters of a town and a parish, as well as Springfield, had given their assent ; and that this has been acquiesced in for more than thirty years. Whether any of these corporations transcended their legal authority or not, it is now too late to disturb their acts. The lapse of time has

shed its healing influences upon the transaction, and if any infirmities existed, has cured them.

In relation to the conveyance of the "ministry lot," there can be no doubt. It was originally ministerial land; it was conveyed and accepted as such, and unquestionably passed to the use of the parish.

Both lots of land were principally applied to parochial purposes. The occasional departures from such use can have no effect upon the nature of the estate. We think there can be no doubt that it vested in the parish and not in the town. Whether it became ministerial or parochial property, viz. whether the fee vested in the parish, or in the minister of the parish and his successors, we have not deemed it necessary to determine.

It is true that if it was of the latter description, a good title could be made only by the coöperation of the minister and parish. The town, acting of necessity in its parochial character, did actually convey the estate, by deeds containing the usual covenants of warranty. They had an interest which would pass by the conveyance, and the title would be good against everybody except the minister of the parish. His ability to interfere, or his actual interference, would not affect the validity of the notes or the right of property in them. The covenants of warranty bound the town in its parochial character, and are now obligatory on the parish. These, with the interest in the estate which passed to the several grantees, constitute a legal and sufficient consideration for the notes.

On the whole, we are of opinion that the organization of the parish in December 1835, was legal and valid; that the land assigned by Springfield to Ludlow became the property of the latter town in its *parochial* capacity; that the proceeds of the sale of the land of course vested in the town in the same capacity, and constituted in their hands a ministerial fund; that the parish, when organized, succeeded to all the parochial property, rights, duties and liabilities of the town, and consequently became the legal owners of the notes in question, which their appropriate officer rightfully and properly holds.

According to the terms of the report, the verdict must be altered into a general verdict for the defendant; and judgment rendered on it.